Nicholas G. **KORDOPATIS**, Plaintiff,

v.

**UNITED STATES**, Defendant.

**Civil Action No. 94–2314.**

United States District Court, E.D. Pennsylvania.

Jan. 13, 1997.

Gary A. Brienza, Allentown, PA, for Nicholas G. Kordopatis.

Robert S. Attardo, Samuel A. Mitchell, Asst. U.S. Attys., Washington, DC, for U.S.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

On April 13, 1994 Plaintiff Nicholas G. Kordopatis filed this action for the refund of penalties assessed under 26 U.S.C. § 6672. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(1). On July 19, 1994 the United States filed a third-party complaint against one Mary Jane Hall;[1] this claim settled before trial. (*See* Stipulation and Order filed September 20, 1996). In its Amended Answer filed on July 27, 1996, the United States counterclaimed against Nicholas G. Kordopatis. This court has subject matter jurisdiction over the counterclaim pursuant to 26 U.S.C. § 7401 and 28 U.S.C. § 1346(c). We conducted a two-day non-jury civil trial on September 25–26, 1996. Pursuant to Fed.R.Civ.P. 52(a) we make the findings of fact set forth below.[2]

### II. FINDINGS OF FACT

1. The parties stipulated at trial that on May 4, 1992 a delegate of the Secretary of the Treasury assessed a penalty pursuant to Internal Revenue Code § 6672 (26 U.S.C.) against the Plaintiff in connection with the failure of Fashion Forward Ltd. ("Fashion Forward") to pay over to the United States the social security and income taxes withheld from the wages of its employees: for the taxable quarter ended June 30, 1990, $2,254.24; for the taxable quarter ended September 30, 1990, $5,151.04; for the taxable quarter ended December 31, 1990, $4,750.70; and for the taxable quarter ended March 31,

1991, $4,939.46 for the total amount of $17,095. The parties further stipulated that proper notice and demand were served on the plaintiff on the date of the tax assessment. Copies of Fashion Forward's form 1120S tax returns cannot be located. Plaintiff Nicholas G. Kordopatis ("Kordopatis") has made certain payments toward the tax assessment of at least $6,184.39. The United States also represented that any moneys which former third-party defendant Hall paid to the United States would be credited to any liability of Kordopatis and would result in a reduction in the amount he would owe if the United States prevailed in this suit. (Tr. 1/11–14). A stipulation and order of judgment for the United States and against Mary Jane Hall ("Hall") for $11,214.10 was entered September 20, 1996. This judgment was satisfied on December 13, 1996.

2. John Lamont ("Lamont") and Kordopatis became friends sometime in 1960 and remained friends for thirty (30) plus years. Practically every Saturday, Lamont and Kordopatis would get together to go to breakfast and do errands. From 1987 through 1992, Kordopatis and Hall were involved in a romantic relationship. (Tr. 1/117:6–12; 2/77:15–21; 2/78:20–25; 2/79:1–10, 13–25; 2/80:1–15).

3. Lamont purchased Juliette Fashions in February 1988 from the previous owners, Solomon and Julia Cotler,[3] utilizing the services of a business broker. Lamont purchased one hundred percent (100%) of the stock in the corporation. (Tr. 1/26–27, 29).

4. Kordopatis was involved in the first general business conversations between Lamont and Solomon Cotler when the question of buying the business arose. (Tr. 1/117:3–118:4). Later when the owners' son Steve

---

**1.** At the time of trial Mary Jane Hall's married name was Mary Jane Jacoby.

**2.** There are three sources for the citations in the findings of fact: (1) trial transcripts from September 25 (Tr. 1) and September 26 (Tr. 2) of 1996; (2) the testimony in the de' bene esse deposition of Jean Krammes taken on February 7, 1995 (Krammes Dep.); and trial exhibits marked as Plaintiff's (Ex. P) or Defendant's (Ex. D).

**3.** When negotiations originally began, Solomon and Julia Cotler were the owners of Juliette Fashions. Upon Solomon's death on October 10, 1988 prior to his acknowledgement of an installment sales agreement, Julia Cotler became the sole owner of Juliette Fashions. She ultimately conveyed all her rights to certain property of Juliette Fashions to her son Steven Cotler on June 15, 1990. (*See* Ex. D–6).

Cotler became involved with the negotiations, Kordopatis would accompany Lamont but Kordopatis did not negotiate. (Tr. 2/153:820).

5. Hall invested money, was issued stock, and served as secretary in the corporation purchased by Lamont which became known as Fashion Forward. (Tr. 1/30). She eventually acquired a fifteen percent (15%) ownership interest in Fashion Forward. (Tr. 1/109:12–23).

6. Lamont purchased the business without the receipt or use of any funds from or on behalf of Kordopatis. Kordopatis did introduce Lamont to a commercial banker for review of Fashion Forward's financial statements. (Tr. 1/28, 2/80:16–25; 2/81:1–4; 2/82:2–24). Kordopatis introduced Lamont to Hall as a potential business partner. (Tr. 1/107:12–24). Kordopatis also had several detailed discussions with Lamont surrounding the acquisition of the business. (Tr. 1/106:24–109:11).

7. Likewise, in 1988, prior to Lamont's acquisition of Fashion Forward, Kordopatis assisted Lamont and Hall in valuing Juliette Fashions at its Pottsville, Pennsylvania location by conducting traffic counts of customers.[4] (Tr. 1/108:4–109:6; 2/82:4–15).

8. Prior to Lamont's acquisition of Fashion Forward, Kordopatis entered into an agreement with Lamont to acquire one-third of "Fashion Forward, Incorporated" for $30,-000. (Ex. D–4 dated February 16, 1988; Tr. 2/114:2–4). This agreement expired without taking effect. (Tr. 1/33–34).

9. Upon the acquisition of the business by Lamont and Hall in March 1988, the Cotlers introduced Kordopatis as an owner in the form of a letter to suppliers and creditors. (Tr. 1/120:6–24; 1/203:3–18; 1/215:22–216:22). The letter was incorrect. (Tr. 1/216:7–14).

10. At no point during the life of Fashion Forward did Kordopatis ever own any shares of stock. He was never an officer or director. He never hired or fired employees nor was he involved with the hiring and firing of employees. Kordopatis never signed a federal tax return nor did he have the authority to do so. (Tr. 1/30, 34, 39, 41; 1/88:19–25; 1/89:1–9, 13–17; 1/90:1–4; 1/212:13–15).

11. Kordopatis was never a partner nor was he an owner of Fashion Forward. At no time was Kordopatis provided with a partnership agreement nor was a partnership formed, nor did he ever receive partnership profits or partnership perquisites. Kordopatis had heard Lamont say on various occasions that he considered Kordopatis a partner but Kordopatis disagreed with such statements and corrected him on occasion. (Tr. 2/90:3–22).

12. Kordopatis was never an employee of the corporation and never received a salary. (Tr. 1/34, 41).

13. Fashion Forward's Pottsville store was located one block away from the Pennsylvania National Bank office where Kordopatis worked as a banker. Kordopatis would visit the Pottsville store on his lunch break from time to time. (Tr. 2/118:12–18).

14. Lamont was President of the corporation Fashion Forward until March 1991. In his capacity as President throughout the life of the corporation Lamont had authority to sign payroll checks as well as tax returns. Lamont signed all federal tax returns for the corporation. Lamont had access to the Pottsville location until the foreclosure in April of 1991. (Tr. 1/30, 34, 39, 41; 1/88:19–25; 1/89:1–9, 13–17; 1/90:1–4; 1/212:13–15).

15. At all times the corporation was in existence, Lamont and Hall were the only persons who had signatory authority on any Fashion Forward bank account. At no time, even after March 1991, did Kordopatis have signatory authority on any Fashion Forward account. Lamont's signature, either written by hand or by a rubber stamp facsimile, appeared on paychecks to himself, paychecks for other employees, as well as on payments to vendors or creditors of Fashion Forward for the entire life of the corporation including periods after December 1990. From 1988 until February 1991, Lamont signed payroll checks as well as checks to the internal revenue service and other taxing authorities for taxes to be paid by Fashion Forward. Hall

**4.** Fashion Forward eventually opened an additional location in Emmaus, Pennsylvania.

also signed payroll checks after February of 1991. Kordopatis never signed any checks for the corporation. (Tr. 1/40, 41, 1/67:11–25; 1/88:19–25; 1/89:1–9; 1/127:22–1/130:12; 1/205:22–24).

16. At all times the corporate bookkeeper was Jean Krammes ("Krammes"). Krammes, in her capacity as bookkeeper, was in charge of handling in-coming mail, opening bills, and reviewing the bills. She was also required to set up a file for vendors and actually drafted checks. (Tr. 1/41; 1/49:16–21;1/50: 5–8, 17–25).

17. At some point during the operation of the corporation, payroll records for the Emmaus store would be sent by Hall to the Pottsville store so that Krammes could prepare payroll and payroll checks. Those records would either be sent by Hall to Krammes directly or picked up by Lamont. (Tr. 1/200:25–201:14). For the life of the corporation Lamont would make pickups of accounts receivable and merchandise from the Emmaus location of Fashion Forward and transfer them to the Pottsville location. The accounts receivable for the Emmaus location were submitted to Krammes. (Tr. 1/208:4–15).

18. The actual checks for Fashion Forward's checking accounts were kept in a locked file cabinet. A signature stamp bearing Lamont's signature was also kept under lock and key. Krammes was present at the Pottsville location on a daily basis. Checkbooks for Fashion Forward were kept in Krammes's or Lamont's desk. The stamp bearing Lamont's signature was kept in Krammes's locked desk. At no time did Kordopatis have a key to the desk utilized by Krammes. (Tr. 1/51:8–14; 1/199:8–25; 1/200:3–19; Krammes Dep. 35:10–15; Krammes Dep. 39:1–8).

19. Lamont visited James Gibisser ("Gibisser") at his office sometime in the fall of 1988 and retained him as the accountant for Fashion Forward. Gibisser, as the accountant for Fashion Forward, prepared federal and state corporate tax returns on a yearly and a quarterly basis, as well as local tax returns. After Krammes prepared payroll taxes and withholding paperwork, Gibisser reviewed it. Only Krammes compiled the cash disbursements, journals and sales journals used by Gibisser to create a financial statement done on a monthly basis. Gibisser also reconciled canceled checks with balance statements. In order to prepare monthly statements and tax returns, Gibisser would contact either Krammes or Lamont. (Tr. 2/6:4–24; 2/8:1–21; 2/9:1–4, 16–25; 2/10:1–15; 2/11:5–8; 2/14:1–4). Gibisser prepared the personal federal, state and local returns for Lamont. (Tr. 1/52:14–25; 1/53:1–9; 1/54:17–23.)

20. Lamont carried Fashion Forward as a long term capital loss starting on April 12, 1987 and continuing until June 4, 1991 on his Schedule D of his 1991 amended tax return. (Tr. 1/55:5–25; 1/56:1–8). Lamont indicated in his 1991 personal tax return that his occupation was the manager/owner of Fashion Forward and that at no time was he managing or owning another business during those same years. (Tr. 2/13:1–14).

21. Kordopatis has never been trained or employed as an economist, certified public accountant, professional accountant, lawyer, financial planner, stockbroker or stock market analyst. Kordopatis graduated from high school in 1954 and did not attend college. He did take some college level courses at Penn State University and Ohio State University pertaining to his banking career. Throughout the vast majority of Kordopatis's working life spanning thirty years, he was a banker involved in consumer credit. At no time was Kordopatis ever a commercial banker as had been stated by Lamont. In addition, Kordopatis at one time helped form a mortgage banking company. (Tr. 1/57:1–25; 1/58:1–2; 2/67:17–25; 2/68:1–8; 2/69–75; 2/70:12–19; 2/75:19–25; 2/77:1–8).

22. Kordopatis provided loans and collateralized a loan on behalf of Fashion Forward due to his long term friendship with Lamont as well as his personal involvement with Hall. (Tr. 2/89:11–25).

23. In particular, on November 28, 1989 and April 6, 1990 Kordopatis pledged collateral totaling at least $50,000 to secure a loan from Pennsylvania National Bank to Fashion Forward. (Tr. 2/116:14–23; Ex. D–21; D–26).

24. In discussing his decision to collateralize a loan to Fashion Forward with his certificate of deposit, Kordopatis testified that he wanted to help both Hall and Lamont to succeed in the business. (Tr. 2/89:7–13).

25. Kordopatis collateralized a loan on behalf of the corporation utilizing his own certificate of deposit at the request of Lamont and Hall. Despite providing cash loans and collateralizing a loan for the corporation, Kordopatis did not receive a partnership agreement, notes, loan documents or compensation in any form. (Tr. 1/45:17–22; 1/46:19–25; 1/47:4–10; 2/86:16–25; 2/87:1–11; 2/88:1–20).

26. After 1989 the Pottsville store had an assistant manager named Chrissy Latchko, who had the role of day to day manager in conjunction with the manager Maggie Citrone, who was located in the Emmaus store. (Tr. 1/194:5–24).

27. Kordopatis was present when the installment sales agreement between the Cotlers and Lamont was executed on February 19, 1988. (Ex. D–6).

28. Kordopatis was present on June 15, 1990, when an installment sale agreement between the Cotlers and Lamont was terminated and replaced with a lease on the business location. (Tr. 2/117:13–24; Ex. D–8; D–9).

29. Subsequent to June 15, 1990 Kordopatis loaned $10,000 to Fashion Forward and Lamont so that they could purchase inventory and supplies. (Tr. 2/117:2–5).

30. From about June 1990 through 1991 Kordopatis was in contact with vendors of Fashion Forward. Krammes claimed that this was to take "the stress away" from Krammes and other workers when Lamont was unwilling to deal with them. (Krammes Dep. 78:4–17; 73:11–74:18). Beginning sometime between June of 1990 to late summer 1990 Krammes would refer all messages to Kordopatis. (Krammes Dep. 20:8–15; Tr. 2/132:23–133:25). Krammes would refer about three or four calls on a daily basis. (Krammes Dep. 18:5–13, 2/132:23–133:25). The only impression Kordopatis gave Krammes of what he was interested in with regard to Fashion Forward was "that he was going to get us away from all of our stress." (Krammes Dep. 84:17–85:2) Kordopatis testified that if a vendor would state, when making arrangements, that the only way goods would be delivered was by COD, he would relay that information to Jean Krammes. (Tr. 2/134:19–135:2; 2/135:3–136:9).

31. Krammes stated that Kordopatis would let her know which vendor bills to pay or hold although she could not recall Kordopatis asking her to print or write out a check to a specific vendor. (Krammes Dep. 24:12–25:16; 27:7–8; 99:10–100:4; Ex. D–28). Nevertheless, Krammes had the impression from Lamont that she was to perform her duties at the direction of Kordopatis during the period from the second half of 1990 into 1991. During this time Lamont had to sign documents because Kordopatis had no legal authority to do so. (Krammes Dep. 82:4–83:5) Krammes stated that she would make lists of creditors for Kordopatis saying which bills were 30, 60, or 90 days overdue and would update them on a monthly or even biweekly basis. (Krammes Dep. 29:3–15). Krammes indicated that Lamont became a "figurehead" in January of 1991 and that she considered Kordopatis to be in a position of authority over her. (Krammes Dep. 22:9–10; 82:16–83:1). However, she had this impression from Lamont, not from Kordopatis. (Krammes Dep. 84:17–85:7).

32. Lamont testified that he never received lists of creditors from Krammes. (Tr. 1/150:5–7). He also testified that Krammes did not have any discretion regarding who and which bills to pay. (Tr. 1/126:4–8). His testimony was vague and did not distinguish between vendors and other creditors. We do not find it as credible as that of Krammes.

33. On July 18, 1990 Kordopatis attended a meeting at Gibisser's office with Lamont at the request of Lamont. On July 28, 1990 Kordopatis attended another meeting at Gibisser's office at the request of Lamont in accordance with their usual Saturday routine. A major topic of discussion at the meetings was Fashion Forward's failure to pay withholding taxes to the Internal Revenue Service for the quarter ended June 30, 1990. At no time during these meetings was there any discussion about Kordopatis paying Internal

Revenue Service taxes for the corporation nor was there any discussion that he would deal directly with the Internal Revenue Service regarding outstanding taxes for Fashion Forward. (Tr. 2/91:19–25; 2/92:1–9, 19–25; 2/93:1–9; Ex. D–37). (Tr. 1/138:5–139:15; 2/46:1–13; 2/48:4–21; 2/48:22–49:8).

34. At one of these meetings in July 1990 Kordopatis represented to Gibisser that he guaranteed that Gibisser would be paid for the services he performed in 1990 and the latter part of 1989. (Tr. 2/58:13–22).

35. Gibisser testified that he felt control of Fashion Forward was changing in July 1990 and that Kordopatis was "involved" because ". . . there would have been no interest for him to be there [at the office] otherwise." (Tr. 2/52:17–18).

36. In the summer of 1990, Gibisser was unaware that Kordopatis and Lamont had been personal friends for approximately twenty-five years and was further unaware that Kordopatis and Hall were involved in a personal relationship. (Tr. 2/61:11–24). As noted in Finding 22, Kordopatis has also put up his own money as collateral. He clearly had an interest to protect. Nevertheless, we do not find that Kordopatis was actively involved at these meetings on behalf of the corporation.

37. On July 30, 1990 Lamont, as President of Fashion Forward, signed a quarterly federal tax return for the corporation, Federal Form 941. (Ex. P–6). Lamont signed the Pennsylvania Employee Quarterly Report for the first quarter of 1990, dated April 30, 1990. (Ex. P–14). Lamont signed the Employee's Quarterly Report for the second quarter of 1990, dated July 30, 1990 as President. (Ex. P–15; Tr. 1/79:14–23; 1/80:9–12, 21–24).

38. Beginning in July 1990, Lamont began to disengage himself from the operations of Fashion Forward. (Tr. 1/214:10–215:7; Krammes Dep. 51:20–52:5). Kordopatis testified that Lamont did not spend enough time at the business. (Tr. 2/118:19–119:3). He testified that in his opinion Fashion Forward ran into financial difficulties because Lamont was not a very good manager. (Tr. 2/118:19–22).

39. In late July of 1990 or early August of 1990; Lamont directed Krammes to prepare paperwork to be supplied to Gibisser to determine or evaluate a potential sales price for the Emmaus store owned by Fashion Forward. Gibisser made market valuations of the Pottsville and Emmaus stores at Lamont's request. Lamont intended to sell the Emmaus store. (Tr. 1/87:5–22; 2/27:1–17). Gibisser received a letter sent by Lamont to the Internal Revenue Service dated August 27, 1990, indicating that it was Lamont's intention to sell the Emmaus store in the "next few weeks." (Tr. 2/28:1–12).

40. In mid-summer of 1990 Hall and Kordopatis had been talking about buying Fashion Forward. Kordopatis was interested in buying the business because Hall was interested in the business. Lamont wanted Kordopatis to buy him out. (Tr. 2/108:11–109:10; Ex. D–27).

41. Gibisser requested power of attorney on behalf of Fashion Forward for the 940, 941 and corporate 1120 taxes for the years 1989 and 1990. On August 28, 1990, in his capacity as President of Fashion Forward, Lamont executed Federal Document 2848 providing a power of attorney to Gibisser to act as proxy on behalf of Fashion Forward in dealing directly with the Internal Revenue Service. After the power of attorney was filed, Gibisser had the authority on behalf of Fashion Forward to deal with the Internal Revenue Service regarding the 940, 941 and 1120 tax issues for the years 1989 and 1990 and it was his purpose to attempt to set up a payment plan for accrued arrearages as well as staying up-to-date with taxes as they became due. (Tr. 1/84:17–25; 1/85:1–9; 2/18:14–15; 2/19:12–24; 2/21:7–8; Ex. P–9).

42. On or about October 2, 1990 Gibisser conversed with an Internal Revenue Service representative regarding 941 payments for the first and second quarters of 1990 and determined that Lamont or Krammes was to send a payment of One Thousand Five Hundred Dollars ($1,500.00) to the Internal Revenue Service on behalf of Fashion Forward. (1/34:1–25; 1/35:1–6).

43. On or about October 7, 1990 Gibisser requested that Krammes provide him with

third quarter information regarding Fashion Forward's ledgers, cash receipts and payroll reports in order to bring the firm up-to-date. (Tr. 2/35:7–25).

44. Gibisser indicated that he directed Krammes to make specific payments on behalf of Fashion Forward on a regular basis and to make required deposits with the Internal Revenue Service. (Tr. 2/50:19–2/51:1).

45. On or about November 6, 1990, Gibisser had a conversation with an Internal Revenue Service representative regarding a problem in crediting the Fashion Forward account for a payment made on October 1, 1990. This payment was pursuant to an arrangement reached between the Internal Revenue Service and Gibisser on behalf of Fashion Forward whereby Five Hundred Dollars ($500.00) was to be paid on a monthly basis towards the outstanding balance and Fashion Forward was to remain current on its on-going obligations for withholding tax payments. When Gibisser learned that there was a problem with the October 1990 payment, he attempted to "track down" the payment check to prove to the Internal Revenue Service that payment had actually been made. After conversing with a representative of the Internal Revenue Service regarding the tax payment plan, Gibisser did not contact Kordopatis regarding the failure to make required payments, did not send any notice to Kordopatis, and did not send the copy of the notice to Kordopatis. (Tr. 2/29:3–25; 2/30:2–6; 2/39:1–14; *see* Ex. P–20).

46. Gibisser received a fax coversheet from Kordopatis dated November 7, 1990 attached to copies of the checks made payable to the Internal Revenue Service from Fashion Forward. Gibisser could not indicate if he had ever directly communicated with Kordopatis regarding the entry by Gibisser into an installment agreement for Fashion Forward with the Internal Revenue Service. Kordopatis had no contact with Gibisser after July 28, 1990 until approximately November 6, 1990 when he received a phone call or message to call Gibisser's office to determine if a check for Fashion Forward had cleared. Since Kordopatis worked at Pennsylvania National Bank, the bank where the Fashion Forward check had been drawn, Kordopatis asked a person in the bookkeeping department to check the file and to fax a copy to Gibisser if the check had cleared. At no time did Kordopatis send any other correspondence to Gibisser. (Tr. 2/32:21–25; 2/33:1–19; 2/50:6–10; 2/96:1–25; 2/97:1–5; 2/99:2–6).

47. At no time between July 28 and November 7, 1990 did Kordopatis discuss with Lamont, Krammes or Gibisser any payment plan or the terms of such a plan that had been arranged by Gibisser for the payment of outstanding Internal Revenue Service obligations. (Tr. 2/94:21–25; 2/95:1–8).

48. On December 27, 1990 Gibisser sent a letter to Fashion Forward addressed to Kordopatis regarding a notice of intent to levy received from the Internal Revenue Service for unpaid withholding taxes for the quarter ended September 30, 1990. (Ex. D–32; Tr. 2/57:8–58:2).

49. Kordopatis never *personally* received any Internal Revenue Service bills related to Fashion Forward, never executed, reviewed, or compiled any Internal Revenue Service forms, and never provided any information leading to the preparation of any Internal Revenue Service returns for Fashion Forward. (Tr. 2/102:4–15).

50. In December 1990 Hall and Kordopatis locked out Lamont from the Pottsville store. (Tr. 1/217: 6–11). Lamont believed that the changing of the locks was done at the request of Hall. (Tr. 1/164:6–8).

51. After Lamont regained entry to the Pottsville store, he told Kordopatis that "he was the boss and that was the way it was going to be." (Tr. 2/99:14–25; 2/100:1–6).

52. From January 1991 through March of 1991 Hall and Kordopatis were given the opportunity by the Cotlers to oversee the day-to-day operations of Fashion Forward in the Pottsville and Emmaus locations. Apparently Mr. Cotler, who was at that point financing the enterprise, had sought this arrangement because he wanted some reassurance that the business could be salvaged. Specifically, Kordopatis would check in from time to time at the Pottsville store. The store had a full time manager and a large

staff and "could basically run on their own." Kordopatis helped "maintain a sense of order" at the Pottsville store but he did not actually operate the business, as he was not an owner. (Tr. 1/170:12–1/171:6; 1/172:1–8; 1/119:16–220:13).

53. On January 4, 1991 Kordopatis entered into a consent agreement with the Cotlers, Hall and Lamont whereby Kordopatis and Hall agreed to "personally guaranty [sic] and become surety for all the obligations of Lamont and Fashion Forward" under a Note, Lease and Purchase Agreement made by Lamont and/or Fashion Forward between March 15, 1988 and June 15, 1990. Under the consent agreement Kordopatis, Hall and Fashion Forward also agreed to "indemnify and hold Lamont harmless from any and all claims, liabilities, losses, damages or expenses incurred by Lamont related to the Note, the Lease, the Purchase Agreement or any other obligations of Lamont to Cotlers, Juliette or other creditors of Fashion Forward." The consent agreement did not specifically mention unpaid taxes and there is no indication in the agreement itself (no exhibits were attached (Tr. 2/124:21–125:5)) that the parties contemplated the Internal Revenue Service as a creditor of Fashion Forward. Lamont testified that he was promised as part of the agreement by Hall and Kordopatis that all liabilities including taxes would be "taken care of." (Tr. 1/131:11–19; 1/146:4–22; Ex. D–30).

54. On January 4, 1991 Kordopatis executed a guaranty and surety agreement, pursuant to which he "ended up" eventually paying $6,000. (Tr. 2/117:25–118:5).

55. Both the guarantee and surety and the consent agreement refer to an agreement among Kordopatis, Lamont and Hall "with respect to the transfer of Lamont's interest in Fashion Forward." (Ex. D–11; D–30). Lamont admitted on direct that he did indeed "enter into agreements among yourselves regarding the transfer of your portion of the business with Mr. Kordopatis and Ms. Hall." (Tr. 1/149:17–20). Lamont admitted that no agreements were ever signed between him, Kordopatis and Hall "whereby the assets of Fashion Forward would be transferred from [Lamont] and Ms. Hall to Ms. Hall and Mr. Kordopatis." (Tr. 1/155:7–25). Lamont also admitted that the consent agreement and the guaranty and surety agreement were based upon the assumption that there would be an actual transfer of the assets of Fashion Forward. (Tr. 1/156:1). On the basis of this evidence, we cannot find that there was ever any executed agreement whereby Kordopatis would get an interest in Fashion Forward.

56. It is clear that there was never any transfer or sale of assets of Fashion Forward to Kordopatis. As of January 4, 1991 when a security agreement, a consent agreement, and a guaranty and surety agreement ("the Agreements") were signed there were no written agreements between Lamont, Kordopatis and Hall for the purchase of assets of Fashion Forward. (See Ex. D–10, D–11, and P–75 for text of the Agreements). Additionally, Lamont, Kordopatis and Hall never signed an agreement whereby the assets of Fashion Forward would be transferred from Lamont to Hall and Kordopatis. The Agreements were all conditioned and dependent upon the actual transfer of the assets of Fashion Forward from Lamont to Hall and Kordopatis. (Tr. 1/100:10–24; 1/155:7–25; 1/156:1–2; 1/227:1–25; 1/228:1–17; 2/111:3–11).

57. Lamont testified that he "guessed" that Kordopatis actually brought over a tax return to his home for the first quarter of 1991 payroll taxes. (Tr. 1/130:13–131:1).

58. Lamont acted in the capacity of President of Fashion Forward on the following occasions. On June 15, 1990 Lamont entered into a five (5) year lease for real estate premises to be used by Fashion Forward. (Ex. D–9) On October 1, 1990, Lamont drafted and signed check number 3613 from the Fashion Forward account in the amount of Five Hundred Dollars ($500.00) payable to the Internal Revenue Service. (Tr. 1/87:23–25; 1/88:1–9). In January 1991 Lamont signed a document binding Fashion Forward to a judgment for two and one half years beyond January 1991. Lamont continued to get paychecks from the corporation until his interest in the corporation was foreclosed in April 1991 by the Cotlers. Lamont's signature or its facsimile appears on Fashion For-

ward checks drafted and executed within and after January, 1991. (Tr. 1/64:18–25; 1/71:15–24; Ex. P–49). On June 4, 1991, Lamont scheduled a meeting of the shareholders and board of directors of the corporation to discuss a potential bankruptcy for the corporation. In September 1991 Lamont executed a document indicating that Fashion Forward was out of business. (Tr. 1/37–1/38, 1/75:19–23, 1/98:16–25, 1/99:1–8; 1/157:17–25; 1/158:1–5).

59. John Lamont's signature was available on a signature stamp at all times for use by Krammes. Lamont testified that it was possible "... but I wouldn't assume that [Kordopatis directed Krammes to send checks out without my knowledge] at all." (Tr. 1/127:7–17). Most of the checks using Lamont's signature in the spring of 1991 were rubber stamped. (Tr. 1/128:4–130:10).

60. The parties agree that Lamont was aware of the existence and fact that Fashion Forward's tax liability was not paid as it accrued. (Tr. 1/78:1–19; Ex. P–43).

61. The Cotlers foreclosed against Lamont sometime in April 1991. At that time, the assets of Fashion Forward were transferred to Hall through a corporation established by her known as Excaliber. Kordopatis was not an officer, director or owner of Excaliber. (Tr. 2/25:21–25; 2/38–39; 2/226:1–19).

62. The parties agree that Krammes, Gibisser and Lamont were responsible for preparation of Fashion Forward's quarterly tax returns. (Tr. 1/210:14–23).

63. The parties also agree that Krammes was responsible for compiling and completing payroll for the Pottsville as well as the Emmaus stores. She was also responsible for calculating taxes for each person's pay. (Krammes Dep. 41:7–19; 42:15–17).

64. At some point, certain utility companies said they would continue service to Fashion Forward only if they received payment from Kordopatis. (Tr. 2/136:10–15).

Kordopatis admits that he paid these utility companies out of his own personal funds. (Response of the Plaintiff, Nicholas G. Kordopatis To the Defendant's Proposed Finding of Fact # 19, filed 11/4/96). It is obvious that Kordopatis did not order that these utilities be paid out of Fashion Forward funds.

## III. DISCUSSION

■ 26 U.S.C. Section 6672(a) provides that a person responsible for withholding and paying over taxes who willfully fails to do so is liable for a penalty equal to the total amount of the unpaid taxes.[5] *Brounstein v. United States*, 979 F.2d 952, 954 (3d Cir. 1992). A section 6672 assessment against a "responsible person" equates with the assessment of a tax. *Id.;* 26 U.S.C.A. § 6671(a) (West Supp.1996). "Once the IRS assesses a tax, a rebuttable presumption arises that the assessment is correct." *Id.* at 954 (citing *Psaty v. United States*, 442 F.2d 1154, 1160 (3d Cir.1971)). Once the IRS introduces certified copies of the assessment in district court, the burden of going forward with evidence shifts to the plaintiff to show that the assessment was incorrect by establishing either "(1) that he was not a responsible person within the meaning of the statute, or (2) that he did not willfully fail to pay the amount due to the IRS." *Id.*

■ The issue is whether or not the Plaintiff Kordopatis has shown he was not a responsible person. "A responsible person under section 6672(a) is a person required to collect, truthfully account for or pay over any tax." *Id.* (citing *Quattrone Accountants, Inc. v. IRS*, 895 F.2d 921 (3d Cir.1990) and *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)). " 'Responsibility is a matter of status, duty, or authority, not knowledge.' " *Id.* (quoting *Quattrone*, 895 F.2d at 927). "While a responsible person must have significant control over the corporation's finances, exclusive control is not nec-

---

5. This section provides in pertinent part: § 6672 Failure to collect and pay over tax, or attempt to evade or defeat tax. (a) General rule.—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. 26 U.S.C.A. § 6672 (West Supp. 1996).

essary." *Id.* " 'A person has significant control if he has the final or significant word over which bills or creditors get paid.' " *United States v. Carrigan,* 31 F.3d 130, 133 (3d Cir.1994) (quoting *Quattrone,* 895 F.2d at 927). "There can be more than one responsible person for a given employer." *Quattrone,* 895 F.2d at 926. "That another person also may be liable does not affect the liability of the person presently subject to suit." *Id.* In determining whether an individual is a responsible person courts also consider:

> (1) contents of the corporate bylaws such as the duties of an officer, (2) ability to sign checks on the company's bank account, (3) taxpayer's signature on the employer's federal quarterly and other tax returns, (4) payment of other creditors in lieu of the United States, (5) identity of officers, directors, and principal stockholders in the firm, (6) identity of individuals in charge of hiring and discharging employees, and (7) identity of individuals in charge of the firm's financial affairs.

*Brounstein,* 979 F.2d at 954–55 (citing *Datlof v. United States,* 252 F.Supp. 11, 32–33 (E.D.Pa.1966), *aff'd,* 370 F.2d 655 (3d Cir. 1966), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967)); *United States v. Carrigan,* 31 F.3d 130, 133 (3d Cir.1994); *Greenberg v. United States,* 46 F.3d 239, 243 (3d Cir.1994).

Kordopatis did not have any formal status, duty, or authority which "required" or even permitted him to collect, account for, or pay over taxes. Without question, Kordopatis was never an officer, director, or stockholder of Fashion Forward. He never received a salary or compensation from Fashion Forward; he was not contractually obligated to collect, account for, or pay over taxes. He never had authority to sign checks with regard to any of Fashion Forward's accounts. He never signed any type of tax return for Fashion Forward. He never had the authority or power to hire or fire employees. He had very limited dealings with Fashion Forward's accountant. He did not deal with the Internal Revenue Service. The only creditors he appears to have paid were the utility companies, and these payments came from his personal funds, not from Fashion Forward's funds.

As noted in our findings of fact, at first Kordopatis was involved with acquisition of the business but the relationship does not appear to have made him a responsible person. A broker was involved with that transaction. Kordopatis never became a shareholder. Instead, Lamont and later Hall became shareholders and corporate officers. The corporation had an accountant for most of its existence. This accountant also had the corporation's power of attorney during some of the taxable quarters in issue. Fashion Forward had a bookkeeper and office managers. The bookkeeper had received specific instructions from the accountant regarding the payments that needed to be made by Fashion Forward.

By late 1989 Kordopatis became involved with Fashion Forward as a lender and a guarantor. However, he was not a secured lender and therefore lacked the ability to easily obtain a judgment against Fashion Forward for the money he used as collateral for the corporation. His status was clearly inferior to that of the Cotlers who were secured creditors and who did indeed eventually foreclose against Fashion Forward.

Under such circumstances, coupled with his personal relationships, it is quite understandable that Kordopatis was concerned about the well being of Fashion Forward. This concern manifested itself in several ways but at no point can he be said to have been "in charge" of financial affairs. Lamont, as indicated by his self reference as the manager/owner of Fashion Forward on his tax returns and his signature on corporate tax returns, remained involved with the financial affairs of the corporation throughout the taxable quarters in issue. Hall also remained involved and purchased the assets of Fashion Forward after the Cotlers' foreclosure. While Kordopatis and Hall were given an opportunity to purchase the business, this process did not confer on Kordopatis any additional status or authority with regard to the tax matters of the corporation. Kordopatis signed an agreement to indemnify the liabilities of Lamont and Fashion Forward, but the agreement referred to a trans-

fer of and interest in the business and was conditioned upon the actual transfer of assets of Fashion Forward to Kordopatis. No agreement was ever signed whereby Lamont's assets were transferred to Kordopatis. Accordingly, the agreement to indemnify Lamont never took effect and did not confer any additional authority, status, or duty upon Kordopatis to pay taxes. Even if the agreement had taken effect, it is not clear that Kordopatis would have had any additional duty, status, or authority to pay taxes independently, other than as an indemnitor.

Beyond their rebuttable presumption, the United States points to Kordopatis's attempt to exert authority with respect to Fashion Forward with Hall in locking Lamont out of the Pottsville store in December 1990. We believe this incident is at best only very indirectly related to the financial and tax affairs of the corporation, and we cannot say that it shows Kordopatis was a responsible person. In fact, given Lamont's lack of knowledge of Kordopatis's involvement in the incident, it appears that Kordopatis was only acting under an umbrella of Hall's authority. We have already discussed his business and personal reasons for wanting to protect the corporation. Had Kordopatis acted alone we might infer corporate authority on his part but this was not the case. Lamont's response to the incident in which he told Kordopatis that he was "the boss" indicated that Lamont would not be abandoning any authority, even to Hall.

The United States respectfully submits that of all the cases located by either party, a First Circuit case, *Caterino v. United States*, 794 F.2d 1 (1st Cir.1986), *cert. denied*, 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987), presents a fact pattern closest to this case. (United States' Post–Trial Brief at 14). *Caterino* involved a plaintiff who was neither an owner, officer, director, or shareholder of a company which failed to pay over withheld trust fund taxes to the Internal Revenue Service. *Caterino*, 794 F.2d at 3–4. Caterino was President of another company, Graham Stuart, which entered into an agreement to purchase the taxpayer corporation. *Id.* at 3. The agreement was never consummated. *Id.* at 3. However, Caterino himself eventually did personally purchase the corporation. *Id.* at 4. During the time that Graham Stuart and the taxpayer corporation were waiting for the purchase agreement to take effect, Caterino loaned money to and helped the taxpayer corporation to obtain additional loans so that it could continue to operate. *Id.* More importantly, Caterino was authorized to sign checks on behalf of the taxpayer corporation. *Id.* at 3.[6] Caterino also was involved in replacing the taxpayer corporation's general manager, an event he referred to as " 'a management change[ ] made by me.' " *Id.* at 4. The district court found he put his weight behind this move although did not have the power to make it himself. *Id.* at 4. After the taxpayer corporation's officers had abandoned the company, its employees forwarded the payroll tax returns to Caterino because of the power vacuum that existed. *Id.* Caterino was involved in seeking tax advice from a certified public accountant who ultimately advised a bookkeeper to sign the returns as an agent of the taxpayer corporation. *Id.*

While there obviously are certain similarities between this case and *Caterino* there are also important differences. Unlike Caterino, Kordopatis never entered a written agreement to purchase Fashion Forward either before or after the tax difficulties arose. Unlike Caterino, Kordopatis never had any authority to sign checks on the taxpayer corporation's bank accounts. Unlike Caterino, Kordopatis never had any authority or involvement in the hiring and firing of employees, let alone general managers. Likewise, Kordopatis never assumed authority because of a power vacuum nor did he ever refer tax matters to a certified public accountant. The corporate officers of Fashion Forward never

---

**6.** The United States writes in its brief that "there was no evidence that Caterino ever wrote a single check to pay a [creditor of the taxpayer corporation]." (United States' Post–Trial Brief at 14). While all the evidence considered by the district court is not clear from the court of appeal's decision cited by the United States, this evidence would not be determinative of the issue on responsibility. Authority, duty and status are the central inquiry when a district court concludes whether a plaintiff is a responsible person.

abandoned the corporation; Hall and Lamont remained corporate officers, with their commensurate corporate duties and authority, during all of the taxable quarters in issue.

There remains nevertheless the difficult issue concerning the contact Kordopatis had with Fashion Forward's vendors in June 1990 through 1991 as set forth in Findings 29 through 31. The issue is whether or not vendors were paid in lieu of taxes due the United States and whether Kordopatis had significant control over those payments. Without a doubt he had no official status or final authority in that regard, but the bookkeeper Krammes had the impression from Lamont (the president) "that she was to perform her duties at the direction of Kordopatis." Because he lacked such formal status, we ultimately must consider to what extent persons others than owners, directors, officers, and employees are potentially liable for penalties under 26 U.S.C. § 6672. The Third Circuit has rarely dealt with this issue. However, in *Quattrone,* the Third Circuit held that a debtor accounting firm could be held liable if it had significant control over the employer's finances. *Quattrone,* 895 F.2d at 927. *Quattrone* noted that a responsible person must be under a duty "to perform the act in respect of which the violation occurs." *Id.* at 927 n. 5 (citing 26 U.S.C. § 6671(b)). In discussing this issue, *Quattrone* also relied on *Adams v. United States,* 504 F.2d 73 (7th Cir.1974). *Id.* at 927. As reasoned in *Adams,* "[R]esponsibility for nonpayment of the tax includes all those so connected with the business as to be responsible for the performance of the act in respect of which the violation occurs." *Adams,* 504 F.2d at 75–76. "§ 6672 is broad enough to reach an entity which assumes the function of determining whether or not the employer will pay over taxes withheld from its employees." *Adams,* 504 F.2d at 76 (citing *Pacific National Insurance v. United States,* 422 F.2d 26, 30 (9th Cir.1970), *cert. denied,* 400 U.S. 883, 91 S.Ct. 116, 27 L.Ed.2d 121 (1970)). In all of the above cited cases, the plaintiff, unlike Kordopatis, assumed a function which involved the determination of whether or not the employer would pay employees or payroll taxes. The function Kordopatis assumed was not broad enough to implicate such a determination. We find that although he had some control over which vendor bills were paid that control did not extend to other creditors and in particular did not extend to any control over payroll or over taxes due the government. As discussed earlier, the fact that Kordopatis paid utilities from his own funds underscores his limited role. Thus, we find that Kordopatis did not have significant control over payments made in lieu of taxes due the United States.

The evidence that Kordopatis lacked authority and actual control of Fashion Forward's financial affairs has come from numerous witnesses and has been abundant. Against this evidence there has been only limited indirect evidence such as the lockout in December 1990 and the dealings with some vendors from June 1990 through 1991. The weight of the evidence compels us to find that Kordopatis has met his burden of proving he was not a responsible person during the taxable periods in issue. Accordingly, we need not reach the issue of whether Kordopatis's conduct was "willful." Judgment will be entered for the plaintiff.

## IV. CONCLUSIONS OF LAW

Pursuant to Fed.R.Civ.P. 52(a) we state the following conclusions of law:

1. Plaintiff Nicholas G. Kordopatis is not an officer, director, employee or shareholder of the corporation Fashion Forward and had no authority to sign checks or hire or fire employees for the same.

2. Plaintiff Nicholas G. Kordopatis was not in charge of the financial affairs of the corporation Fashion Forward and never paid taxes or signed tax returns for them.

3. Plaintiff Nicholas G. Kordopatis never paid other creditors in lieu of taxes on behalf of the corporation Fashion Forward.

4. Plaintiff Nicholas G. Kordopatis has proven he is not a interested person under 26 U.S.C. § 6672(a).